# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>v.<br><br>Shawn David Reilly (2),<br><br>Defendant. | Case No. 16-cr-0189-2 (JRT/HB)<br><br><br>**REPORT AND RECOMMENDATION** |

Thomas M. Hollenhorst, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415, for United States of America

Glenn P. Bruder, Mitchell Bruder & Johnson, 7505 Metro Boulevard, Suite 325, Edina, MN 55439, for Shawn David Reilly

---

HILDY BOWBEER, United States Magistrate Judge

This case came before the undersigned United States Magistrate Judge for a pretrial motion hearing on September 6 and 7, 2016. The case has been referred for resolution of pretrial matters pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1. In this Report and Recommendation, the Court will address Defendant Shawn David Reilly's Motion to Suppress Evidence Obtained as a Result of Search and Seizure and Motion to Suppress Defendant's Statements, Admissions, and Answers [Doc. No. 42]. The parties' nondispositive motions were addressed in a separate Order [Doc. No. 56]. For the reasons set forth below, the Court recommends that the motion to suppress be denied in its entirety.

I.      **Procedural Background**

On July 12, 2016, Shawn David Reilly was charged by Indictment with one count

of Conspiracy to Distribute Methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and

846; and two counts of Possession with Intent to Distribute Methamphetamine, in

violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C).  (Indictment [Doc. No. 1].)[1]  Reilly filed

the motion to suppress evidence at issue on August 16, 2016.  According to his original

motion and his attorney's remarks at the hearing, Reilly is seeking to suppress evidence

seized from his vehicle as a result of a traffic stop and search of his vehicle on June 22,

2016.  He also asks to suppress statements he made to a law enforcement officer on

June 23, 2016, and evidence seized pursuant to search warrant executed at his residence

on June 23, 2016.

The Government submitted six exhibits into evidence at the pretrial motion

hearing: (1) Gov't Ex. 1: an audio recording of statements Reilly made on June 22 and

23, 2016; (2) Gov't Ex. 2: an application, supporting affidavit, and search warrant for the

north half of a duplex located at 13xx Fourth Avenue Southwest in Rochester, Minnesota;

(3) Gov't Ex. 3: a criminal complaint and statement of probable cause filed in *Minnesota*

*v. Reilly*, Case No. 74-CR-16-1305 (Steele Cty. Dist. Ct. June 24, 2016); (4) Gov't Ex. 4:

Register of Actions for *Minnesota v. Reilly*, Case No. 74-CR-16-13051305 (Steele Cty.

Dist. Ct.); (5) Gov't Ex. 5: a state court order dated June 23, 2016, assigning the Third

District Public Defender to represent Reilly; and (6) Gov't Ex. 6: Owatonna Police

---

[1]  The Indictment charged another individual, Ron Curtis Hill, with related offenses, but Hill did not file any pretrial motions.  Hill entered a plea of guilty to Count 2 of the Indictment on October 17, 2016.

Department Manual Patrol Procedure 306: Impounding and Releasing Motor Vehicles.

Minnesota Bureau of Criminal Apprehension Special Agent Thomas Oliveto and

Owatonna Police Officer John Petterson testified as witnesses for the Government.

Reilly testified on his own behalf.

In Reilly's post-hearing memorandum, he confirmed he is seeking to suppress

evidence on the following grounds: (1) the traffic stop of his vehicle violated the Fourth

Amendment; (2) even if the stop was lawful, the search of the vehicle violated the Fourth

Amendment; (3) the search warrant for his residence contained information derived from

the unlawful stop and search of his vehicle; and (4) his statements to Officer Oliveto on

June 23 were obtained in violation of the Fifth and Sixth Amendments. (Def.'s Mem.

Supp. Mot. Suppress at 7 [Doc. No. 76].)

## II.    Relevant Facts

On May 16, 2016, Agent Oliveto received a phone call from Agent Sean Cooper

of the South Central Drug Investigation Unit. (Mot. Hr'g Tr. 1 at 8:20-22 [Doc. No.

62].)[2] Agent Cooper said he had an individual in custody, Ron Curtis Hill, who had

information about a methamphetamine dealer, a white male named "Shawn," who lived

in Rochester, Minnesota. (Mot. Hr'g Tr. 1 at 8:23-25, 9:1, 9:16-18.) Hill did not know

"Shawn's" last name. According to Hill, "Shawn" lived near the fairgrounds, close to a

Walgreens, and drove an older, green car with dents and rust, possibly a Toyota. (Mot.

---

[2] The transcript of the September 6, 2016, hearing is docketed at Doc. No. 62. The transcript of the September 7, 2016, hearing is docketed at Doc. No. 63. The two transcripts are paginated consecutively. The Court cites to the September 6 transcript as "Mot. Hr'g Tr. 1" and the September 7 transcript as "Mot. Hr'g Tr. 2."

Hr'g Tr. 1 at 9:19-22; 31:14-17, 48:11-14.)  Agent Oliveto showed Hill a Google map of

the area, and Hill identified "Shawn's" house as a duplex on the corner of 14th Street SW

and 5th Avenue SW in Rochester.  (Mot. Hr'g Tr. 1 at 10:17-21, 13:15-17.)  Hill said he

had purchased methamphetamine from "Shawn" at "Shawn's" house ten to fifteen times

over the previous three months.  (Mot. Hr'g Tr. 1 at 9:23-25, 10:1-2.)  Hill also said

"Shawn" had a tattoo of a cross on his elbow and was about thirty-six years old.[3]  (Mot.

Hr'g Tr. 1 at 9:5-6, 31:22-25.)

After speaking with Hill, Agent Oliveto called the Task Force Commander for the

Violent Crimes Enforcement Team in Rochester and asked if he knew anyone by the

name "Shawn" at the duplex identified by Hill.  (Mot. Hr'g Tr. 1 at 10:13-16, 10:22-24.)

The Task Force Commander did not, but he offered to assist in the investigation by

checking local databases and driving by the residence.  (Mot. Hr'g Tr. 1 at 10:24-25,

11:1-2.)  After determining the address was 13xx Fourth Avenue Southwest, Agent

Oliveto drove by the residence and saw the individual he subsequently identified as

Shawn Reilly[4] outside.  (Mot. Hr'g Tr. 1 at 11:3-9, 32:15-25.)  The agent observed

suspicious activity during subsequent surveillance.  (Mot. Hr'g Tr. 1 at 11:24-25, 12:1-

---

[3] Agent Oliveto later learned, when he arrested Reilly, that Reilly is about ten years older
than Hill thought.  (Mot. Hr'g Tr. 1 at 32:1-4.)

[4] At the motion hearing, Agent Oliveto pointed to Defendant Shawn Reilly and identified
him as the individual whom Hill described as "Shawn" and whom Agent Oliveto
observed at the residence and in the events leading up to the traffic stop.  (Mot. Hr'g Tr. 1
at 11:3-19.)  Accordingly, the Court will hereinafter refer to the individual Agent Oliveto
observed as "Reilly," except when it is necessary to indicate that Agent Oliveto did not
yet know "Shawn's" last name.

24.)  Specifically, vehicles came and went from the house, but stayed only five to ten

minutes at a time.  Generally, only one individual would leave the vehicle, while others

remained in the car.  The individual would meet with Reilly, who was doing construction

work in the yard, and the two would walk together out of Agent Oliveto's sight.  Based

on Agent Oliveto's experience and training, he concluded the activity was drug

trafficking.  (Mot. Hr'g Tr. 1 at 13:4-9.)

At some point during the surveillance of Reilly's house, Agent Oliveto determined

that Reilly drove a green Acura, not a Toyota.  (Mot. Hr'g Tr. 1 at 13:18-24, 31:18-21.)

The car was not registered to anyone named "Shawn," however.  (Mot. Hr'g Tr. 1 at

33:10-14.)  During surveillance on June 22, 2016, Agent Oliveto saw the Acura drive

away from the residence.  (Mot. Hr'g Tr. 1 at 13:18-20, 13:24-25, 14:1.)  Agent Oliveto

followed, hoping to conduct a traffic stop and ascertain "Shawn's" last name.  (Mot. Hr'g

Tr. 1 at 14:3-6.)  He did not know at first if "Shawn" was in the vehicle, but he was able

to determine at a stoplight that he was the driver.  (Mot. Hr'g Tr. 1 at 36:8-9, 36:19-25,

37:4-12.)  The Acura proceeded to Highway 52 North, then exited on to Highway 14

heading westbound out of Rochester toward Owatonna.  (Mot. Hr'g Tr. 1 at 14:9-12.)

Hill lived in Owatonna.  (Mot. Hr'g Tr. 1 at 14:18-20.)

As Agent Oliveto followed the Acura, he noticed it was traveling well above the

legal speed limit, both when it was leaving Rochester and when it entered the four-lane

area of Highway 14 where the speed limit increased from 55 to 65 mph.  (Mot. Hr'g Tr. 1

at 15:3-10; Mot. Hr'g Tr. 2 at 19:16-19.)  Although Agent Oliveto did not have a radar

device, he determined that the Acura was speeding based on his own speed as he

followed the Acura and the increasing distance between his car and the Acura.  (Mot. Hr'g Tr. 1 at 15:11-18.)  Agent Oliveto was traveling at 65 to 70 mph.  (Mot. Hr'g Tr. 1 at 15:19-20.)  He concluded the Acura was traveling more than 65 mph.  (Mot. Hr'g Tr. 1 at 15:22-24.)

As Reilly's car was leaving the Rochester area, Agent Oliveto contacted Agent Cooper and asked if he could arrange for a squad car to set up surveillance along westbound Highway 14 to observe a possible traffic violation.  (Mot. Hr'g Tr. 1 at 14:21-24, 39:17-20.)  Agent Cooper was familiar with the investigation from his previous interaction with Hill.  (Mot. Hr'g Tr. 1 at 39:21-24.)  Agent Oliveto described the Acura to Agent Cooper and continued to follow it.  (Mot. Hr'g Tr. 1 at 40:3-4, 40:15-21.)  His speed varied between 65 and 75 mph.  (Mot. Hr'g Tr. 1 at 42:4-9.)

Officer Petterson was the patrol officer assigned to assist Agent Oliveto in stopping the Acura and identifying the driver.  (Mot. Hr'g Tr. 1 at 69:25, 70:1-6.)  Officer Petterson knew the stop was related to a narcotics investigation.  (Mot. Hr'g Tr. 1 at 70:9-11.)  Agent Oliveto gave Officer Petterson regular updates on the Acura's location, speed, and appearance as Agent Oliveto followed the car.  (Mot. Hr'g Tr. 1 at 42:7-11, 42:14-16, 51:11-13.)  Agent Oliveto told Officer Petterson to search the vehicle once it was stopped if there was legal justification to do so.  (Mot. Hr'g Tr. 1 at 44:5-9.)

Officer Petterson testified that Agent Oliveto told him the Acura was traveling about 76 mph as the Acura crested an overpass over Highway 218.  (Mot. Hr'g Tr. 1 at 51:11-13.)  From his location in the median of Highway 14, Officer Petterson saw two cars cresting the hill at the same time.  (Mot. Hr'g Tr. 1 at 51:18-25.)  His radar unit

6

registered a speed of 76 mph, but he did not know which of the two cars his radar detected.  (Mot. Hr'g Tr. 1 at 52:1-3, 53:13-16.)  The cars appeared to him to be traveling at about the same speed.  (Mot. Hr'g Tr. 1 at 73:18.)  Officer Petterson surmised that the Acura was speeding because it was traveling at about the same speed as the other car and there were no other cars in the immediate area that would have interfered with the radar signal.  (Mot. Hr'g Tr. 1 at 52:7-20.)  He did not lock the screen on the radar display, which was consistent with his typical practice not to do so.  (Mot. Hr'g Tr. 1 at 75:21, 76:8-20.)

Reilly testified that he saw Officer Petterson's police car parked in the median of Highway 14 after he crested the hill.  (Mot. Hr'g Tr. 2 at 102:20-24.)  His cruise control was set at 65 or 66 mph, and he checked his speed when he saw the police car.  (Mot. Hr'g Tr. 2 at 103:4-9.)  Reilly also noticed a car ahead of him in the same lane of traffic. (Mot. Hr'g Tr. 2 at 103:10-22.)  Reilly did not believe he was speeding, although he conceded it was possible.  (Mot. Hr'g Tr. 2 at 104:6, 107:5-10.)

When the Acura and the other car came into Officer Petterson's view, both cars slowed down as they passed Officer Petterson's car.  (Mot. Hr'g Tr. 1 at 52:21-24.) Officer Petterson verified that the Acura was the vehicle described by Agent Oliveto, and Officer Petterson pulled out from the center median on to westbound Highway 14 and activated his squad car video.  (Mot. Hr'g Tr. 1 at 54:1-8; Mot. Hr'g Tr. 2 at 88:8-10.) When Agent Oliveto saw Officer Petterson's squad car enter Highway 14, Agent Oliveto exited the highway.  (Mot. Hr'g Tr. 1 at 40:22-25, 41:1.)

The Acura was traveling about 65 mph at this point, and "it took a little while" for

7

Officer Petterson to catch up to it.  (Mot. Hr'g Tr. 1 at 54:8-10.)  When Officer Petterson

approached the Acura, it was traveling in the right lane of traffic behind several other

cars.  (Mot. Hr'g Tr. 2 at 88:11-25, 89:1.)  Officer Petterson engaged his lights and

stopped the car.  (Mot. Hr'g Tr. 1 at 54:9-11.)  He asked the driver for his license and

insurance and verified that the driver's name was Shawn Reilly.  (Mot. Hr'g Tr. 1 at

54:17-21.)  Officer Petterson checked Reilly's driver's license status on his squad car

computer, which displayed the status as "cancelled IPS."  (Mot. Hr'g Tr. 1 at 55:10-13.)

"IPS" is the abbreviation for "inimical to public safety."  (Mot. Hr'g Tr. 1 at 55:13-14.)

Officer Petterson also learned that Reilly was not the registered owner of the Acura.

(Mot. Hr'g Tr. 1 at 1:57:20.)  Reilly gave Officer Petterson a yellow receipt for a

Department of Motor Vehicles temporary driver's license issued in August 2015.  (Mot.

Hr'g Tr. 1 at 55:5-7; Mot. Hr'g Tr. 2 at 90:1-4, 90:24-25, 91:1-2.)  The receipt indicated

that some payments had been made, but not that the license had been reinstated.  (Mot.

Hr'g Tr. 1 at 56:1-7; Mot. Hr'g Tr. 2 at 91:2-3, 91:12-15.)  Driving with a license

cancelled IPS is a gross misdemeanor for which the driver is typically arrested, taken to

jail, and charged by criminal complaint.  (Mot. Hr'g Tr. 1 at 57:4-7; Mot. Hr'g Tr. 2 at

89:20-22.)  The license plates are also removed from the driver's vehicle.  (Mot. Hr'g

Tr. 1 at 57:21-23.)  Officer Petterson informed Reilly that he was under arrest.  (Mot.

Hr'g Tr. 2 at 91:16-24.)  Approximately thirteen minutes had passed since the Acura was

stopped.  (Mot. Hr'g Tr. 2 at 96:1-11.)

Officer Petterson decided to impound the Acura for several reasons: Reilly was

not the registered owner of the Acura; the owner was not present; both occupants of the

8

vehicle would be taken into custody; the Acura's license plates would be removed; and the Acura was parked at the base of a ramp from County Road 45, which was a high traffic area on a major highway. (Mot. Hr'g Tr. 1 at 57:23-24, 62:7-21.) Officer Petterson testified that he relied on sections I.A, I.B, and I.C of the Owatonna Police Department vehicle impoundment policy to impound the Acura. (Mot. Hr'g Tr. 1 at 63:19-25; Gov't Ex. 6.) Section I.A provides that vehicle may be impounded "[w]hen the vehicle driver has been cited for No MN D.L., DAR, DAS, DAC, and the vehicle is not legally parked or creates a safety hazard and the driver cannot make reasonable arrangements to have the vehicle moved." (Gov't Ex. 6 at 1.) Section I.B provides that vehicle may be impounded "[w]hen the vehicle is uninsured and the vehicle is not legally parked or creates a safety hazard." (*Id.*) Section I.C provides that vehicle may be impounded "[w]hen the owner or the driver (if the owner is not present or competent) is arrested and the vehicle is not legally parked or creates a safety hazard and the driver/owner cannot make reasonable arrangements to have the vehicle moved." (*Id.*) Reilly asked for permission to call someone to come and move the vehicle, but Officer Petterson denied his request. (Mot. Hr'g Tr. 2 at 91:25, 92:1-5.)

Reilly's girlfriend, Katie Johnson, was a passenger in the Acura. (Mot. Hr'g Tr. 1 at 16:15-17.) Another officer who had arrived at the scene, Officer Callahan, asked Johnson to exit the vehicle and identify herself. (Mot. Hr'g Tr. 1 at 59:20-21.) Officer Callahan then spoke with Johnson about where she and Reilly were going and what they were doing. (Mot. Hr'g Tr. 1 at 59:21-25.) Officer Petterson noticed that Johnson's purse, which she had taken out of the Acura, "was extremely large and bulging," so he

9

asked if she had taken anything from the car and put it in her purse. (Mot. Hr'g Tr. 1 at 60:7-12.) She said no and that everything in the purse was hers. (Mot. Hr'g Tr. 1 at 60:10-15.) Officer Petterson asked to look in the purse, and Johnson consented. (Mot. Hr'g Tr. 1 at 60:16-17.) By this time, about thirty minutes had passed since the Acura was stopped. (Mot. Hr'g Tr. 2 at 96:22-25.) Before Officer Petterson looked in Johnson's purse, he smelled an odor of marijuana emanating from it. (Mot. Hr'g Tr. 1 at 61:18-20.) Once he looked inside the purse, Officer Petterson saw "a digital scale that had crystal, what I believed was methamphetamine" and two syringes. (Mot. Hr'g Tr. 1 at 61:16-18.) Johnson was arrested for possession of methamphetamine. (Mot. Hr'g Tr. 1 at 61:25, 62:1.)

Based on the methamphetamine seized from Johnson's purse, Officer Petterson decided to conduct a canine sniff of the perimeter of the Acura with his certified narcotics dog. (Mot. Hr'g Tr. 1 at 64:17-25; 65:1-2.) The canine alerted on the front passenger-side door, indicating the presence of cocaine, methamphetamine, heroin, or marijuana. (Mot. Hr'g Tr. 1 at 65:15-19.) Officer Petterson next opened the trunk of the Acura to begin an inventory search. (Mot. Hr'g Tr. 1 at 65:22-25, 66:1-3.) He had briefly opened the trunk earlier during the encounter, but was sidetracked by other activities and conversations, and shut the trunk before he saw anything inside. (Mot. Hr'g Tr. 1 at 66:5-10, 66:15-20.) The second time he opened the trunk and searched it, he found a bag containing approximately two kilograms of methamphetamine. (Mot. Hr'g Tr. 1 at 16:22-25, 67:15-25.) The Acura was later towed to an impound lot. (Mot. Hr'g Tr. 1 at 68:6-10.) Reilly was transported to the Steele County Jail. (Mot. Hr'g Tr. 2 at 104:12-

10

14.)

At approximately 5:25 p.m. on June 22, Agent Oliveto attempted to speak with Reilly at the Steele County Jail. (Mot. Hr'g Tr. 1 at 17:2-4, 17:7-8, 21:6-8.) The attempted interview occurred in a room at the jail, and Reilly was not handcuffed. (Mot. Hr'g Tr. 1 at 17:8-13.) Agent Oliveto told Reilly why he had been arrested and advised him of his *Miranda* rights. (Mot. Hr'g Tr. 1 at 17:15-16; Gov't Ex. 1.) Reilly said he understood his rights. (Mot. Hr'g Tr. 1 at 17:19-21; Gov't Ex. 1.) In response to Agent Oliveto's question about his destination, Reilly said, "I really don't feel like I should answer any questions right now." (Gov't Ex. 1.) Agent Oliveto asked, "Okay, you don't want to talk at all?" (Gov't Ex. 1.) Reilly answered, "No." (Gov't Ex. 1.) Agent Oliveto ended the interview at that time. (Gov't Ex. 1.)

Reilly testified at the motion hearing that he did not answer any questions on June 22 because he thought he needed a lawyer. (Mot. Hr'g Tr. 2 at 104:19-21.) He further testified that he had requested an attorney by filling out some paperwork during the booking process. (Mot. Hr'g Tr. 2 at 104:22-25.) The Register of Actions for Reilly's state court case contains a June 23 entry for "Application for Public Defender." (Gov't Ex. 4 at 3.) At 8:59 a.m. on June 23, a state court judge issued an order assigning the Third District Public Defender to represent Reilly. (Gov't Ex. 5; Mot. Hr'g Tr. 1 at 29:14-18.)

Meanwhile, Agent Oliveto called the Rochester Police Department and requested that Reilly's residence be secured until a search warrant could be obtained. (Mot. Hr'g Tr. 1 at 21:13-23.) The search warrant was issued on the morning of June 23, 2016.

11

(Mot. Hr'g Tr. 1 at 21:3-12; Gov't Ex. 2.)  Officers seized a pound of methamphetamine

from Reilly's residence during the execution of the warrant.  (Mot. Hr'g Tr. 1 at 23:2-8.)

After the warrant was executed, Agent Oliveto interrogated Reilly again at the jail.

(Mot. Hr'g Tr. 1 at 23:11-17.)  Before he did so, he asked Agent Cooper to call the

county attorney's office and ask if Reilly was represented by counsel or had made an

appearance in court.  (Mot. Hr'g Tr. 1 at 25:25, 26:1-9.)  Reilly had been in custody

approximately twenty-four hours at that point.  (Mot. Hr'g Tr. 1 at 26:5-7.)  An assistant

county attorney told Agent Cooper that Reilly had not made an appearance in court and

was not represented.  (Mot. Hr'g Tr. 1 at 26:12-15.)  Agent Oliveto made no other

attempt to determine if Reilly was represented.  (Mot. Hr'g Tr. 1 at 46:7-15.)  It is Agent

Oliveto's understanding that state law permits an individual to be detained for up to

thirty-six hours without being formally charged.  (Mot. Hr'g Tr. 1 at 26:16-20.)

Agent Oliveto interrogated Reilly in a room at the jail, and Agent Cooper also

attended.  (Mot. Hr'g Tr. 1 at 23:18-25; Gov't Ex. 1.)  The interview was recorded.  (Mot.

Hr'g Tr. 1 at 24:1-3; Gov't Ex. 1.)  Agent Oliveto wore plain clothes and did not have

any weapons.  (Mot. Hr'g Tr. 1 at 24:4-7.)  The agent fully advised Reilly of his *Miranda*

rights before he asked any questions, and he told Reilly he could stop the interrogation at

any time.  (Mot. Hr'g Tr. 1 at 23:19-23; Gov't Ex. 1.)  Reilly said he understood his

rights.  (Mot. Hr'g Tr. 1 at 25:2-6; Gov't Ex. 1.)

During questioning, Reilly was coherent, but appeared slightly tired.  (Mot. Hr'g

Tr. 1 at 24:19-22.)  He tracked Agent Oliveto's questions.  (Mot. Hr'g Tr. 1 at 24:23-25,

25:1; Gov't Ex. 1.)  The interrogation lasted about fifty minutes, and Reilly made several

incriminating statements.  (Mot. Hr'g Tr. 1 at 25:7-8, 25:19-24.)  Reilly never asked for

an attorney or to stop the interrogation.  (Mot. Hr'g Tr. 1 at 25:10-14.)

About thirty-five minutes into the interview, Agent Oliveto thanked Reilly for

participating in the interview and told Reilly he was able to speak with him at that time

because Reilly was not yet represented by counsel.  (Gov't Ex. 1.)  Reilly said he had

requested an attorney on the paperwork he filled out in booking.  (Gov't Ex. 1.)  Agent

Oliveto explained that a judge would determine whether he was eligible for appointed

counsel at his first appearance.  (Gov't Ex. 1.)  Reilly said he thought he would be

eligible for an appointed attorney.  (Gov't Ex. 1.)

Reilly was formally charged with first-degree controlled substance possession on

June 24, 2016.  (Mot. Hr'g Tr. 1 at 26:21-23; Gov't Ex. 3.)  He had his first appearance at

11:00 a.m. that day and was represented by public defender Grant Sanders.  (Gov't Ex. 4

at 4.)  The Government proffered at the hearing, and Defendant did not object, that

Sanders did not establish an attorney-client relationship with Reilly until the first

appearance.  (Mot. Hr'g Tr. 1 at 28:16-21, 28:25:25.)  Sanders had not heard of or met

with Reilly until that proceeding.  (Mot. Hr'g Tr. 1 at 28:21-23, 29:1-2.)

III.   **Discussion**

A.      **The Stop of Reilly's Vehicle Was Supported by Probable Cause**

Reilly argues that Officer Petterson lacked probable cause to stop his vehicle.  The

stop of a motor vehicle is a "seizure" that implicates the Fourth Amendment.  *Delaware*

*v. Prouse*, 440 U.S. 648, 653 (1979).  "It is well established that even a minor traffic

violation provides probable cause for a traffic stop."  *United States v. Williams*, 429 F.3d

767, 771 (8th Cir. 2005).  In particular, speeding gives officers probable cause to conduct a traffic stop.  *See United States v. Neumann*, 183 F.3d 753, 756 (8th Cir. 1999) (finding probable cause where defendant was traveling five mph over the speed limit).  An officer's subjective belief or pretextual motive does not invalidate the lawful basis for the stop.  *Williams*, 429 F.3d at 771.

The Court finds that Reilly was driving faster than the legal speed limit, and thus, Officer Petterson had probable cause to stop his car for speeding.  As Agent Oliveto followed the Acura, he observed based on his own speed that the Acura's speed varied between 65 and 75 mph, which exceeded the legal speed limit.  As the Acura crested an overpass, Agent Oliveto told Officer Petterson that the Acura was traveling about 76 mph.  This corresponded with Officer Petterson's radar reading of 76 mph.  It is not significant that Officer Petterson could not ascertain which of the two cars his radar had registered, because the cars were traveling in tandem at about the same rate of speed, as observed by Officer Petterson, and because Officer Oliveto's observations confirmed that Reilly's car had been traveling well over 65 mph.

In concluding that Reilly was speeding, the Court finds the testimony of Agent Oliveto and Officer Petterson more credible than Reilly's testimony that he was not speeding.  Agent Oliveto's testimony was consistent with the radar reading obtained by Officer Petterson and with Officer Petterson's testimony.  Agent Oliveto and Officer Petterson testified clearly and consistently about the events and circumstances leading up to the traffic stop, and the Court finds their testimony credible.

Even if the Court were to accept Reilly's testimony as credible, his testimony did

not incontrovertibly establish that he was not speeding.  Reilly testified it was possible

that he could have been speeding and that he may have set his cruise control at 66 mph,

which was higher than the legal speed limit.

In sum, the Court concludes that Officer Petterson had probable cause to stop

Reilly's vehicle for speeding.

**B.     The Search of the Acura Was Lawful**

Reilly next contends that the search of the Acura was unlawful because, insofar as

the search was an inventory search, it was not conducted in compliance with the

Owatonna Police Department's vehicle impoundment policy.  Reilly relies on Sections

I.A and I.C of the policy, which permit a police officer to impound a vehicle under

certain conditions including when "the driver cannot make reasonable arrangements to

have the vehicle moved."  (Gov't Ex. 6 at 1.)  Reilly argues that Officer Petterson should

have allowed him to call someone and have the Acura moved.

There are several exceptions to the Fourth Amendment's search warrant

requirement for vehicles, one of which "allows law enforcement to inventory the contents

of a lawfully impounded vehicle without a warrant or probable cause."  *United States v.*

*Taylor*, 636 F.3d 461, 464 (8th Cir. 2011).  When towing and impounding a vehicle, an

officer "may conduct a warrantless search and inventory in order to protect the owner's

property, to protect the police against claims of lost or stolen property, and to protect the

police from potential danger."  *United States v. Hartje*, 251 F.3d 771, 775 (8th Cir. 2001).

The search must be reasonable in light of the totality of the circumstances.  *Id.*

"[I]nventory searches conducted according to standardized police procedures, which

15

vitiate concerns of an investigatory motive or excessive discretion, are reasonable."

*United States v. Marshall*, 986 F.2d 1171, 1174 (8th Cir. 1993).  The Government bears

the burden to establish reasonableness.  *Taylor*, 636 F.3d at 464.

    The Government argues that Reilly's vehicle was lawfully searched and

impounded pursuant to Section I.D. of the Owatonna Police Department vehicle

impoundment policy, which permits impoundment when a vehicle "must be towed for a

parking or other traffic violation which constitutes a public hazard."  (Gov't Ex. 6 at 1.)

Section I.D does not include the possibility of the driver making reasonable arrangements

to have the vehicle moved.  Officer Petterson testified that he decided to impound the

Acura because the Acura was not registered to Reilly; the owner was not present; both

occupants of the vehicle were being taken into custody; the Acura would have had its

license plates removed; and the Acura was parked at the base of a ramp on a major

highway in a high traffic area.  Although Officer Petterson did not refer specifically to

Section I.D in his testimony, his testimony established that the criteria for impoundment

under Section I.D were met.  The Court finds that the location of the Acura, parked along

a major highway in a high traffic area, without license plates, was a parking or other

traffic violation and constituted a public hazard.  Consequently, Officer Petterson had a

lawful basis for towing and impounding the Acura, and the inventory search was

reasonable under the circumstances.

    Even if Officer Petterson acted pursuant to Section I.A or Section I.C of the

impoundment policy, an officer's refusal to allow a defendant to contact someone to

move a vehicle, even when the police department's impoundment policy would so allow,

16

does not implicate the Fourth Amendment. *United States v. Arrocha*, 713 F.3d 1159, 1164 (8th Cir. 2013). "Nothing in the Fourth Amendment requires a police department to allow an arrested person to arrange for another person to pick up his car to avoid impoundment and inventory." *United States v. Agofsky*, 20 F.3d 866, 873 (8th Cir. 1994) (*cited in Arrocha*, 713 F.3d at 1164).

There is also an alternative basis for the legality of the search. The search of the Acura was permissible under the automobile exception to the Fourth Amendment.

> Under the automobile exception to the Fourth Amendment's warrant requirement, a police officer who has lawfully made a roadside stop of a vehicle may search the passenger compartment and trunk of that vehicle if probable cause exists to believe that contraband or evidence of criminal activity is located inside the vehicle.

*United States v. Walker*, --- F. 3d ----, No. 15-2921, 2016 WL 6080792, at *3 (8th Cir. Oct. 18, 2016).

Here, while waiting for the tow truck to arrive, Officer Petterson obtained Johnson's consent to look in her purse. He smelled the odor of marijuana emanating from her purse, and he saw drugs and drug paraphernalia inside the purse during the consent search. This gave him probable cause to believe the Acura had been used to hold and transport narcotics and to search the Acura for contraband. *See United States v. Caves*, 890 F.2d 87, 91 (8th Cir. 1989) (odor of marijuana); *McZorn v. Johnson City Police Dep't*, No. 3:08-cv-0726, 2009 WL 5216946, at *4 (N.D.N.Y. Dec. 30, 2009) (drugs in purse). Officer Petterson also had probable cause to search the Acura based on the canine sniff alerting him to the presence of narcotics. *See United States v. Bloomfield*, 40 F.3d 910, 919 (8th Cir. 1994).

### C.     Reilly's June 23, 2016, Statements Were Not Obtained in Violation of the  Fifth Amendment or the Sixth Amendment

Reilly seeks to suppress the statements he made to Agent Oliveto on June 23, 2016, as having been obtained in violation of his Fifth and Sixth Amendment rights.

### 1.     Fifth Amendment

Under *Miranda v. Arizona*, "the prosecution may not use statements . . . stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."  384 U.S. 436, 444 (1966).  Those procedural safeguards are met when, "[p]rior to any questioning, the person [is] warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."  *Id.  Miranda* warnings are required for official interrogations where a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way."  *Stansbury v. California*, 511 U.S. 318, 322 (1994).

Agent Oliveto first attempted to interview Reilly after his arrest on June 22, 2016. After he advised Reilly of his *Miranda* rights and asked Reilly a question, Reilly said, "I really don't feel like I should answer any questions right now."  Agent Oliveto asked, "Okay, you don't want to talk at all?"  Reilly answered, "No."  "To effectively invoke a *Miranda* right, a suspect must indicate 'a clear, consistent expression of a desire to remain silent.'"  *United States v. Thompson*, 866 F.2d 268, 272 (8th Cir. 1989) (quoting *United States v. Johnson*, 56 F.3d 947, 955 (8th Cir. 1995)); *see Mann v. Thalacker*,

246 F.3d 1092, 1100 (8th Cir. 2001) ("Being evasive and reluctant to talk is different from invoking one's right to remain silent.")  An individual's invocation of a Fifth Amendment right must be unequivocal and unambiguous.  *See United States v. Davis*, 512 U.S. 452, 459 (1994) (right to counsel); *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010) (right to remain silent).

Reilly does not argue that he unequivocally invoked his right to remain silent at the time of this first attempted interview.  (*See* Def.'s Mem. Supp. Mot. Suppress at 16-18, 20.)  Nonetheless, the Court finds his language was equivocal and left open the possibility that he would "feel like" answering questions at a later time.  Moreover, Reilly did not invoke any particular constitutional right—his right to remain silent or his right to counsel—in declining to talk to Agent Oliveto on June 22.  Reilly now offers a *post hoc* explanation that he probably thought he needed a lawyer, but he did not indicate that to Agent Oliveto on June 22.

Agent Oliveto interviewed Reilly the next day, on June 23, while Reilly was still in custody at the Steele County Jail.  Although Reilly had requested an attorney on a form filled out during the booking process, there is no evidence that Agent Oliveto was aware of that fact at the beginning of the interrogation.  Agent Oliveto did ascertain from the county attorney's office before the June 23 interrogation that Reilly was not represented by counsel and had not made an appearance in court.  Reilly provides no authority that filling out a request for court-appointed counsel established an unequivocal and unambiguous invocation of his right to counsel or his right to remain silent, and the Court concludes they did not.

Before Agent Oliveto asked Reilly any questions on June 23, the agent advised Reilly of his *Miranda* rights and said he could stop the interrogation at any time. Reilly did not invoke his right to remain silent or to counsel at that time, equivocally or unequivocally. Rather, Reilly said he understood his rights, and he responded to Agent Oliveto's questions.

The Court turns briefly to the issue of waiver, even though Reilly does not raise it, because a suspect's response to custodial interrogation does not necessarily establish a voluntary, knowing, and intelligent waiver of rights. "To establish a valid *Miranda* waiver, the Government must show that the waiver was knowing, intelligent, and voluntary." *United States v. Woods*, 829 F.3d 675, 680 (8th Cir. 2016). The Government has met its burden here. Agent Oliveto advised Reilly of his *Miranda* rights, and Reilly said he understood those rights. Reilly then freely and willingly responded to Agent Oliveto's questions. Consequently, Reilly's waiver of *Miranda* rights was valid. *See Klingler v. United States*, 409 F.2d 299, 308 (8th Cir. 1969) (finding defendant's waiver knowing, intelligent, and voluntary when he was advised of *Miranda* rights, said he understood his rights, and selectively answered questions, even though he refused to sign the written waiver form).

Approximately thirty-five minutes into the interrogation, Agent Oliveto mentioned that Reilly was not yet represented by counsel. Reilly said he had requested an attorney on a form he had completed during the booking process. This was the first time Reilly mentioned anything about an attorney. Agent Oliveto explained that a judge would determine whether Reilly was financially eligible for appointed counsel at his first

appearance, to which Reilly indicated that he would be eligible.  The Court finds that

Reilly's remarks were not an unequivocal and unambiguous invocation of his right to

counsel.  *See Davis*, 512 U.S. at 462 (holding that the statement "Maybe I should talk to a

lawyer" was not a request for counsel and did not require agent to stop questioning

individual).  Nor did Reilly invoke his right to remain silent at this time, unequivocally or

otherwise.

For the above reasons, the Court concludes that Reilly's June 23 statements were

not obtained in violation of the Fifth Amendment. [5]

### 2.      Sixth Amendment

Reilly next contends his Sixth Amendment right to counsel was violated by Agent

---

[5] Even if Reilly unequivocally invoked his right to remain silent on June 22, the Court
would find that Agent Oliveto's June 23 interrogation was lawful.  As Reilly does not
argue that he unequivocally invoked his right to remain silent during the attempted
interview on June 22, neither party addressed this issue in their post-hearing memoranda.
The Court will briefly address the issue, however, in the event Reilly raises it on
objection.

Three factors are relevant to determine whether a police officer "scrupulously
honored" a suspect's right to remain silent: "(1) whether the police immediately ceased
the interrogation upon defendant's request; (2) whether they resumed questioning only
after the passage of a significant period of time and provided a fresh set of *Miranda*
warnings; and (3) whether they restricted the later interrogation to a crime that had not
been the subject of the first interrogation."  *Hatley v. Lockhart*, 990 F.2d 1070, 1073-74
(8th Cir. 1993) (citing *Michigan v. Mosley*, 423 U.S. 96, 106 (1975)).  Here, Agent
Oliveto immediately ceased questioning on June 22, thus satisfying the first factor.  More
than twenty hours passed before questioning was resumed, and Agent Oliveto
administered a full set of *Miranda* warnings before the second interrogation.  An interval
of more than two hours is a "significant passage of time."  *See id.* at 1074.  Thus, the
second factor is met.  The third factor is not dispositive when the first two factors are
present.  *See id.*  The question is whether the police tried to wear down the suspect's
resistance by repeatedly questioning him on the same subject, *United States v. House*,
939 F.2d 659, 662 (8th Cir. 1991), which did not occur here.

Oliveto's June 23 interrogation.  The Court concludes otherwise on two independent

grounds.

First, Reilly's Sixth Amendment right to counsel had not yet attached when he was

interrogated on June 23.  "The long-standing rule is that the Sixth Amendment right to

counsel does not attach until 'the initiation of adversary judicial criminal proceedings—

whether by way of formal charge, preliminary hearing, indictment, information, or

arraignment.'"  *United States v. Morriss*, 531 F.3d 591, 593 (8th Cir. 2008) (quoting

*Kirby v. Illinois*, 406 U.S. 682, 689 (1972)).  The very terms of the Sixth Amendment

limit the "right of the '*accused*' to assistance of counsel in 'all criminal *prosecutions*,'"

and thus the right "does not attach until a *prosecution* is commenced."  *Rothgery v.

Gillespie Cty.*, 554 U.S. 191, 198 (2008) (quoting *McNeil v. Wisconsin*, 501 U.S. 171,

175 (1991)) (emphases added).  The Supreme Court in *Rothgery* left no room for doubt:

"the right to counsel attaches at the initial appearance before a judicial officer," and "the

first formal proceeding is the point of attachment."  *Id.* at 199, 203 (citations omitted).

The Court concluded:

> We merely reaffirm what we have held before and what an overwhelming
> majority of American jurisdictions understand in practice: a criminal
> defendant's initial appearance before a judicial officer, where he learns the
> charge against him and his liberty is subject to restriction, marks the start of
> adversary judicial proceedings that trigger attachment of the Sixth
> Amendment right to counsel.

*Id.* at 213.

Reilly's Sixth Amendment right to counsel did not attach until his first appearance

on June 24, 2016.  As such, Agent Oliveto did not infringe his Sixth Amendment right to

counsel by interrogating him the day before.

Second, even if the Sixth Amendment right to counsel had attached before the June 23 interrogation, Reilly effectively waived that right. "[O]nce the adversary judicial process has been initiated, the Sixth Amendment guarantees a defendant the right to have counsel present at all 'critical' stages of the criminal proceedings," including interrogation. *Montejo v. Louisiana*, 556 U.S. 778, 786 (2009). A defendant may waive his Sixth Amendment right to counsel "so long as relinquishment of the right is voluntary, knowing, and intelligent." *Id.* "The defendant may waive the right whether or not he is already represented by counsel," and "the decision to waive need not itself be counseled." *Id.* When a defendant is advised of his *Miranda* rights and waives those rights, that is sufficient also to waive the Sixth Amendment right to counsel. *Id.*

The Court has already determined that Reilly's waiver of his Fifth Amendment right to counsel was valid, and this waiver also effectively waived Reilly's Sixth Amendment right to counsel. *See id.* The Court has also already determined that Reilly did not unambiguously and unequivocally invoke his right to counsel at any point during his interactions with law enforcement. Reilly concedes this point. (Def.'s Mem. Supp. Mot. Suppress at 17 [Doc. No. 76].) This finding is significant because a waiver of the Sixth Amendment right to counsel after an initial, unequivocal invocation of the right is ordinarily invalid. *See Montejo*, 556 U.S. at 797. Because Reilly did not unambiguously and unequivocally invoke his right to have counsel present during the custodial interrogation, Agent Oliveto was not required to cease questioning and make counsel available. *Cf. Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981).

### D.    The Search Warrant Is Valid

Reilly moves to suppress evidence seized pursuant to the search warrant executed at 13xx Fourth Avenue Southwest on June 23, 2016.  His sole basis for suppression is that the supporting affidavit contained evidence and information obtained unlawfully from the Acura and from his statements to Agent Oliveto.  The Court has concluded that the stop and search of the Acura were lawful and that Reilly's statements were lawfully obtained.  Consequently, evidence obtained pursuant to the search warrant should not be suppressed.

Accordingly, based on the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendant Shawn David Reilly's Motion to Suppress Evidence Obtained as a Result of Search and Seizure and Motion to Suppress Defendant's Statements, Admissions, and Answers [Doc. No. 42] be **DENIED**.

Dated:  November 4, 2016

  s/ *Hildy Bowbeer*
HILDY BOWBEER
United States Magistrate Judge

### NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

24

Under D. Minn. LR 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.